**Monroe S. HARRIS, Plaintiff,**

v.

**NEW YORK STATE DEPARTMENT OF HEALTH Defendant.**

No. 01–CIV. 3343.

United States District Court, S.D. New York.

April 24, 2002.

J. Clayton Culotta, Kenneth J. Haber, Law Office of Kenneth Joel Haber, P.C., Rockville, MD, Don D. Buchwald, Law Office of Don Buchwald, L.L.P., New York City, for Plaintiff.

Leonard Arthur Cohen, Attorney General of the State of New York, New York City, for Defendant.

## DECISION AND AMENDED ORDER

MARRERO, District Judge.

Plaintiff Monroe S. Harris ("Harris") brought this action challenging the revocation by defendant New York State Department of Health ("DOH" or the "State") of his medical license by reason of various charges of professional misconduct, including instances of incompetent and grossly negligent patient care, fraudulent reporting and failure to maintain proper records. Harris claims that DOH's action failed to make accommodations for his alleged learning and attention deficit disabilities, thereby discriminating against him in violation of Title II of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101, *et seq.*, and § 504 of the Rehabilitation Act of 1973 (the "Rehabilitation Act" or " § 504"), 29 U.S.C. § 794, *et seq.* Harris also asserts violations of his federal constitutional due process and statutory rights protected by 42 U.S.C. § 1983.

The State moved pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss Harris's First Amended Complaint on the grounds that the claims there asserted are barred by doctrines precluding federal district court appellate review or relitigation of matters already adjudicated in state courts, as well as by the Eleventh Amendment to the United States Constitution. For the reasons set forth below the motion to dismiss is granted.

## I. *STANDARD OF REVIEW*

Different legal standards govern a court's review of motions to dismiss made

pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1), it is a court's duty to resolve disputed jurisdictional facts. *See Cargill International S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1019 (2d Cir.1993); *see also Ruhrgas A.G. v. Marathon Oil Co.*, 526 U.S. 574, 583, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999); *Lyndonville Savings Bank & Trust Co. v. Lussier*, 211 F.3d 697, 700 (2d Cir.2000) ("[F]ailure of subject matter jurisdiction is not waivable and may be raised at any time by a party or the court *sua sponte*."). A court may fulfill its duty by reference to evidence outside the pleadings. *See Zappia Middle East Construction Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir.2000). Furthermore, in resolving a challenge to subject matter jurisdiction, a court does not draw inferences in favor of the plaintiff. *See Newsom–Lang v. Warren International*, 129 F.Supp.2d 662, 663–64 (S.D.N.Y.2001).

A district court may grant a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) only if it appears beyond doubt that the non-moving party could prove no set of facts that would entitle it to relief. *See Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Valmonte v. Bane*, 18 F.3d 992, 998 (2d Cir.1994). In reviewing the pleadings, a court must accept the non-moving party's well-pleaded factual allegations as true. *See Hishon*, 467 U.S. at 73, 104 S.Ct. 2229; *Dove v. Fordham*, 56 F.Supp.2d 330, 335 (S.D.N.Y.1999). Furthermore, a court may consider documents attached to the complaint as exhibits, or incorporated by reference, as well as any documents that are integral to, or explicitly referenced in, the pleading. *See Stuto v. Fleishman*, 164 F.3d 820, 826 n. 1 (2d Cir.1991); *Ciambriello v. County of Nassau*, 137 F.Supp.2d 216, 222 (E.D.N.Y. 2001).

## II. FACTS

Harris alleges that from childhood on and continuing throughout his life he has suffered from learning disabilities, of which he was not fully aware until recently, that caused him substantial difficulties at all schools he attended. Despite these impediments, Harris asserts, he graduated from medical school in 1963 and one year later was issued a license to practice medicine and surgery in New York State, where he was board certified in the areas of family practice, geriatric and bariatric medicine. For over thirty years he maintained a practice in Queens County, New York, and held staff privileges at five separate hospitals. Beginning 1989 Harris experienced difficulties with various New York State regulatory agencies and was the subject of several administrative proceedings detailed below.[1]

---

1. Portions of the factual recitation below derive from the Determination and Order, dated February 4, 1999 (the "BPMC Order") of the State Board for Professional Medical Conduct ("BPMC") issued in In the Matter of Monroe Harris, D.O., annexed to Affidavit of Leonard A. Cohen, dated June 20, 2001 (the "Cohen Aff."), Ex. A, accompanying the Memorandum of Law in Support of Defendant's Motion to Dismiss the First Amended Complaint, dated November 5, 2001. In his First Amended Complaint, Harris refers to and quotes from the BPMC Order and from the record of the BPMC proceeding. (*See* First Amended Complaint (the "Complaint" or "Compl.") ¶¶ 56–63.) On a motion to dismiss challenging the Court's subject matter jurisdiction pursuant to Fed. R.Civ. P. 12(b)(1), the Court may conduct its own jurisdictional inquiry, and in that connection consider relevant materials outside the pleadings. *See Cargill Int'l*, 991 F.2d at 1019. For this purpose the Court examined the BPMC record and other related materials referred to below. Moreover, the Court takes notice of the contents of these public documents since they are referred to, quoted and used as the basis for some of the

### A. THE BCS AND OPMC INVESTIGATIONS

In 1992, following an audit commenced in 1989 by the DOH's Bureau of Controlled Substances ("BCS"), Harris entered into a stipulation with the BCS (the "BCS Stipulation") in which he acknowledged that he had made errors in storing and dispensing controlled substances at his medical office in Queens, New York, in violation of Article 33 ("Article 33") of the State's Public Health Law ("PHL"). Two years later, allegedly prompted by the BCS audit of Harris, BPMC commenced a formal investigation of Harris for professional misconduct. In this connection, in September 1994 Harris and the DOH's Office of Professional Medical Conduct ("OPMC") stipulated to a Consent Order (the "Consent Order") in which Harris admitted to violations of Article 33.[2] By terms of the Consent Order, Harris was fined, put on probation, his license placed on stayed suspension for two years and he was required to file quarterly audits. Harris's license was reinstated in October 1994.

### B. HOSPITAL REAPPOINTMENT APPLICATIONS

On three separate occasions between September 1990 and September 1992 Harris filed applications for reappointment to various hospitals where he held privileges to practice medicine. In each case, while the BCS investigation remained pending,

he responded "No" to a question on the application inquiring whether he was the subject of any disciplinary action. Again in May 1994, in a similar application for medical practice privileges at another hospital, Harris failed to disclose that he had signed the BCS Stipulation in 1992.

In a reappointment application he filed at the Catholic Medical Center in September, 1994 he omitted to disclose that he had been disciplined by BCS and that just days before he had executed the Consent Order with OPMC agreeing to the stayed suspension and other sanctions. In March 1996, as a consequence of an inquiry by the Catholic Medical Center which revealed the 1994 Consent Order, Harris's appointment renewal to practice at the hospital was denied. Subsequently, in his application in November, 1996, to the State Department of Education for renewal of his medical license he failed to acknowledge that his practice privileges at a hospital had been terminated in March, 1996.

### C. THE BPMC PROCEEDING

In October, 1998, BPMC filed a Statement of Charges (the "Statement of Charges")[3] against Harris. It alleged several counts of misconduct arising from Harris's reappointment applications, including fraudulent practice, moral unfitness, and making or filing false reports, as well as negligence, incompetence and failing to maintain records in connection with

allegations in Harris's complaint. *See Cortec Indus. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir.1991), *cert. denied*, 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992).

**2.** BPMC is authorized pursuant to PHL § 230 to undertake disciplinary proceedings in cases involving misconduct by physicians. Charges of professional misconduct may be commenced if the director of the OPMC determines that a hearing is warranted following consultation with the BPMC executive secre-

tary and with the concurrence of a BPMC investigation committee comprised of two physicians and a lay member. The disciplinary proceeding is also conducted by BPMC board committees similarly constituted, with an administrative law judge or officer authorized to rule on motions and objections. *See* PHL § 230A(7), 10(a)(iv) & 10(e).

**3.** The State of Charges are set forth in Appendix One of the BPMC Order.

his medical practice. (*See* Statements of Charges at ¶¶ A–F.) The counts regarding negligence and incompetence on more than one occasion allege Harris's failure to perform adequate medical examinations, to provide proper treatment and prescribe appropriate drugs, and to maintain accurate records related to the care he rendered to three specific patients, referred to as Patients A, B and C. (*See id.* at ¶ G–I.)

A hearing by a BPMC committee was conducted in November and December, 1998. In this connection, Harris introduced the testimony of Dr. Steven Migden ("Migden"), a clinical psychologist Harris retained to examine him in preparation for the BPMC hearing. Migden testified at the December hearing that Harris suffered from certain learning disabilities, including disorders of written expression and dyslexia and possibly attention deficit hyperactivity disorder ("ADHD") and that further testing was necessary to rule out dementia. He asserted that these disabilities "might" have caused Harris to misunderstand or be confused by the hospital reappointment application forms he had filed. (*See* BPMC Order at 7.)

At the conclusion of the hearing in February 1999 the BPMC issued its ruling and Order. It sustained the six charges of fraudulent practice and six charges of making or filing false statements. The BPMC rejected as "implausible" Harris's contention, as suggested by Migden, that his learning disabilities might have caused him to misunderstand and be confused by the questions on the hospital reappointment applications. (*See id.*) The BPMC hearing committee, noting that at the 1996 Catholic Medical Center reappointment hearings Harris offered several reasons to explain the manner in which he answered the applications as he did, stressed that

"[a]t no time did he claim that he was confused due to a learning disability." (*Id.* at 8.)

The BPMC also upheld the specifications charging negligence on more than one occasion and incompetence on more than one occasion arising from Harris's medical care of Patients A and C.[4] The findings as to Patient A indicate that Harris failed to make an adequate physical examination, to make a proper diagnosis of the patient's condition and to maintain proper records of treatment. Moreover, Harris inappropriately prescribed an appetite suppressant drug to Patient A for nine years even though the patient was not overweight. (*Id.* at 11–12.) As regards Patient C, the BPMC found that Harris's treatment constituted gross negligence, specifically in prescribing to a patient with a history of heart disease a drug contraindicated for persons suffering from such condition. With respect to the counts alleging failure to maintain adequate records, the BPMC noted that Harris had submitted two sets of records. One was hand written and the other was a much more detailed typed version, from which the BPMC inferred that the latter was not prepared contemporaneously but later in anticipation of review. (*Id.* at 22–23.)

Having concluded that the number and nature of the charges sustained were sufficiently serious, the BPMC revoked Harris's medical license. (*Id.* at 23.)

D. *THE ADMINISTRATIVE REVIEW BOARD*

Harris appealed the BPMC's ruling to the State Administrative Review Board ("ARB") pursuant to PHL § 230–c(4)(a). In June 1999 the ARB issued a decision

---

4. With regard to Patient B, the BPMC concluded that Harris's treatment "just barely met the minimum standards of acceptable medical care." (BPMC Order at 22.)

and order (the "ARB Order")[5] which sustained the BPMC's determination as to both its findings of professional misconduct by Harris and its revocation of his medical license.

Harris alleges in the Complaint that the ARB accepted that Harris was disabled and treated him as such, but refused to accept that his disability could have manifested itself as asserted by Migden and also refused to offer him reasonable accommodations. In fact, the ARB found sufficient evidence on the record to support the BPMC's conclusion that Harris had answered the hospital reappointment and license renewal applications falsely and with the requisite intent to mislead. (*See* ARB Order, at 9–10.) The ARB considered and rejected Harris's defense attributing his false answers to confusion and lack of understanding of the forms brought about by his claimed learning disabilities. It held that the BPMC had acted properly within its authority as fact finder in rejecting the explanations that the testimony of Harris and Migden offered for Harris's misleading applications. (*Id.*) The ARB also upheld the BPMC's findings of fact and judgments concerning the sufficiency of the evidence and credibility of the witnesses in concluding that Harris's treatment of Patients A and C fell below the level of accepted medical standards. (*Id.* at 8.)

Finally, the ARB sustained the revocation of Harris's license as an appropriate penalty under the circumstances, finding no mitigating considerations sufficient to outweigh Harris's misconduct and rejecting his contention that the penalty was excessive and grounded on various errors. (*Id.* at 12–13.)

In the ARB proceeding, Harris raised six grounds contesting the BPMC Order, none of which argued that his learning disabilities explained or excused the negligent or incompetent medical care he rendered to Patients A and C, as determined by the BPMC. (*See* ARB Order at 5–6.)

### E. THE ARTICLE 78 PROCEEDING

Harris sought judicial review of the ARB's ruling pursuant to PHL § 230–c(5) by commencing an action in the State Supreme Court, Appellate Division, under Article 78 of the New York Civil Practice Law and Rules ("Article 78"). There he renewed his argument that his false answers on the hospital and State licensing applications could be explained and excused by his learning disabilities. The Appellate Division heard oral argument on September 12, 2000 and issued a ruling on October 19, 2000. It unanimously rejected Harris's argument, upheld the ARB's ruling and dismissed the petition. *See Harris v. Novello*, 276 A.D.2d 848, 714 N.Y.S.2d 365 (N.Y.A.D. 3rd Dep't 2000). The court found "unavailing here" Harris's arguments that the hospital reappointment and medical license renewal application forms were too difficult for him to understand, responding that "[t]he administrative finder of fact is 'free to reject [a] plaintiff's explanations' or excuses for false answers on applications, and so long as its determination is not arbitrary or capricious, it will be confirmed." *Id.* at 368. The court rejected Harris's argument that the revocation penalty was excessive. *See id.* at 368. The Appellate Division also found in the record a substantial basis to sustain the BPMC's charges of negligence and incompetence as regards Harris's care of Patients A and C. *See id.* Harris did

---

**5.** Harris references the ARB Order in his complaint and relies upon it as a source of some of his allegations. (*See* Compl. ¶¶ 66– 69.) On this basis the Court will take notice of the document, a copy of which was submitted by DOH as Ex. B of the Cohen Aff.

not seek leave to file an appeal with the New York Court of Appeals.

## F. *THE NOVEMBER 2, 2000 LETTER*

Harris underwent further evaluation by Migden in January and March 2000. Although not specified in the Complaint, Harris contends that Migden issued a report (the "2000 Report") which allegedly was sent to counsel on July 10, 2000, two days prior to the deadline for the submission of Harris's reply in the Article 78 proceeding. The Complaint asserts that in the results of this subsequent testing, Migden ruled out the possibility of dementia and confirms that Harris has "a static, lifelong learning disability involving written language (i.e., dyslexia and written expression disorder) and a related, chronic problem with attention and concentration that is probably best described as ADHD." (Compl. at ¶ 48). On the basis of the alleged new evidence and findings Harris maintains were contained in Migden's 2000 Report, Harris wrote to DOH on November 2, 2000 (the "November 2000 Letter") requesting administrative reconsideration of the revocation of his license. Harris states that although he requested a response within thirty days, DOH ignored the November 2000 Letter.

This litigation followed. Harris here asserts four causes of action arising out of the State's failure to acknowledge and accommodate his learning disabilities prior to revoking his medical license: violations of the ADA and the Rehabilitation Act; deprivation of property and liberty rights without due process in violation of the Fourteenth Amendment of the federal Constitution; and denial of federal rights protected under 42 U.S.C. § 1983.

## III. *DISCUSSION*

### A. *BACKGROUND*

This case presents a convergence of several powerful imperatives embodied in our legal system, all of them fundamental to the effective administration of justice and to the proper functioning of the system's separate federal and state components. The parties collide over which of several basic legal principles implicated in their dispute should govern its resolution: whether this Court should exercise its jurisdiction and serve as a forum to vindicate federal rights asserted under 42 U.S.C. § 1983, or whether it is precluded from doing so by reason of a judgment previously rendered in a related proceeding in state court involving the same parties; whether the Court, responding to the invocation of federal law protecting federal rights, should conduct its own inquiry into the merits of the violations asserted, or be bound by the state court's prior decision on the underlying matter; whether the Court should consider federal law questions that allegedly were not actually decided by the state court, or give full effect to the state adjudication as to claims that could have been raised in that proceeding but were not.

At such junctures, in the ensuing confluence and clash of premises, doctrines, policies and objectives, substantial confusion and directional tension often abounds. So here, the parties' conflict over the decisive issues mirrors doctrinal splits that have driven the courts and engendered ambiguity and divided guidance over the same questions. Thus, an overview of the various precepts and policies underlying this action may inform the Court's approach in resolving them. To this end, the Court notes several principles that flow into the mix, and are classified for the purposes of this discussion as concerning matters of structure, comity, access and efficiencies pertaining to the legal system.

#### 1. *Structure*

The structural principles reflect that, from the beginning, the constitutional

blueprint of this country's justice system actually comprised "two essentially separate legal systems, each of which "proceeds" independently of the other with ultimate review in [the Supreme Court] of the federal questions raised in either system." *Atlantic Coast Line R.R. Co. v. Brotherhood of Locom. Engrs.*, 398 U.S. 281, 286, 90 S.Ct. 1739, 26 L.Ed.2d 234 (1970). At the time the federal courts structure was established following the ratification of the national Constitution, each state already had in place its own distinct judicial system. The superimposition of the federal scheme thus required special sensitivity as to how the parallel justice network would function with regards to matters entailing overlapping jurisdiction.

### 2. *Comity*

The reality of the dual plan raised a potential for inevitable conflicts and frictions that made it difficult for the overall justice system to "function if state and federal courts were free to fight each other for control of a particular case." *Id.* Accordingly, to enable the distinct parts to operate harmoniously and effectively within their separate spheres and avoid unnecessary tension, several Congressional statutes and judicial doctrines have endeavored to draw lines providing demarcation and guidance in certain areas where federal-state jurisdictional overlap exists. *See id.* (citing *Oklahoma Packing Co. v. Oklahoma Gas & Elec. Co.*, 309 U.S. 4, 9, 60 S.Ct. 215, 84 L.Ed. 537 (1940)). Among these prescriptions, some of them central to the resolution of the matter at bar and further discussed below, the following are the most prominent.

### a. *Full Faith and Credit.*

As an integral part of its measures to implement the Constitution's Full Faith and Credit Clause [6], Congress in 1790 enacted the Full Faith and Credit Statute,[7] codified in 28 U.S.C. § 1738. That legislation, intended to ensure that federal courts extend to state court decisions the same effect accorded to those judgments under the law of the particular state where the judgments are rendered, provides in pertinent part:

> [J]udicial proceedings [of any State court] . . . shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State. . . .

*See Allen v. McCurry*, 449 U.S. 90, 96, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980); *Migra v. Warren City Sch. Dist. Bd. of Ed.*, 465 U.S. 75, 80–81, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984); *Kremer v. Chemical Const. Corp.*, 456 U.S. 461, 466, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982).

### b. *Anti–Injunction.*

Congress also legislated early in our history to enable state courts to adjudicate disputes without undue interference from federal courts. To this end, it enacted the anti-injunction statute, 28 U.S.C. § 2283, which derives from an Act of 1793 [8] and provides that:

---

**6.** That provision states:

> Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general laws prescribe the manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof.

U.S. Const., Art. IV, § 1.

**7.** *See* Act of May 26, 1790, Ch. 11, 1 Stat. 122, re-enacted in the Act of March 27, 1804, ch. 56, 2 Stat. 298–99.

**8.** The antecedent Judiciary Act of 1793 provided: "[N]or shall a writ of injunction be granted [by any federal court] to stay pro-

A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

*See also Younger v. Harris,* 401 U.S. 37, 43, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *Atlantic Coast Line,* 398 U.S. at 286–87, 90 S.Ct. 1739; *but cf. Mitchum v. Foster,* 407 U.S. 225, 242–43, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972).

#### c. *Preclusion Rules.*

■ To further ensure that federal courts accord state court judgments the same preclusive effect given to such decisions by the rendering state courts, the Supreme Court, in construing 28 U.S.C. § 1738, has held that the doctrines of *res judicata* and collateral estoppel apply to bar relitigation in federal court of certain issues and claims actually settled or that could have been raised in prior state proceedings. *See Allen,* 449 U.S. at 105, 101 S.Ct. 411; *Migra,* 465 U.S. at 85, 104 S.Ct. 892.

#### d. *Review by Certiorari*

■ In defining the appellate jurisdiction of federal courts, Congress prescribed an avenue for direct review by the Supreme Court of final state court judgments grounded on federal law. *See* 28 U.S.C. § 1257.[9] Based on this statute and general principles of federal-state comity, the Supreme Court has held, as enunciated in the doctrine denominated *Rooker–Feldman,* that the exclusive forum for appellate review of state court decisions construing federal law is the Supreme Court.

*See Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 416, 44 S.Ct. 149, 68 L.Ed. 362 (1923); *District of Columbia v. Feldman,* 460 U.S. 462, 482–83, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); *Atlantic Coast Line,* 398 U.S. at 296, 90 S.Ct. 1739; *see also ASARCO Inc. v. Kadish,* 490 U.S. 605, 622, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989) ("The *Rooker–Feldman* doctrine interprets 28 U.S.C. § 1257 as ordinarily barring direct review in the lower federal courts of a decision reached by the highest state court, for such authority is vested solely in this Court.").

Lower federal courts, therefore, lack subject matter jurisdiction to serve as appellate tribunals for the purpose of reversing or modifying such state court judgments, even if grounded on erroneous reading or application of federal law. *See Feldman,* 460 U.S. at 476, 103 S.Ct. 1303; *ASARCO,* 490 U.S. at 622, 109 S.Ct. 2037; *Texaco Inc. v. Pennzoil Co.,* 784 F.2d 1133, 1142 (2d Cir.1986), *rev'd on other grounds,* 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987) ("[A]n inferior federal court established by Congress pursuant to Art. III, § 1, of the Constitution may not act as an appellate tribunal for the purpose of overruling a state court judgment, even though the judgment may rest on an erroneous resolution of constitutional or federal law issues. The exclusive procedure for federal review is that specified in 28 U.S.C. 1257."); *Moccio v. New York State Office of Court Adm'n,* 95 F.3d 195, 197 (2d Cir.1996).

#### e. *Abstention.*

■ In some cases the constraints on federal court intrusion into state judicial

ceedings in any court of a state...." Act of March 2, 1793, 1 Stat. 335, c. 22 § 5.

**9.** The statute provides in pertinent part:

Final judgments or decrees rendered by the highest court of a State in which a decision

could be had, may be reviewed by the Supreme Court by writ of certiorari where ... the validity of a statute of any State is drawn into question on the ground of its being repugnant to the Constitution, treaties, or laws of the United States.

proceedings may apply even when the federal courts presumptively are vested with jurisdiction. The Supreme Court has instructed federal courts to abstain, under general principles of comity and federalism, from granting injunctive relief to restrain state judicial proceedings, not only in criminal cases but in certain civil actions in which the exercise of federal jurisdiction would disturb federal-state comity, whether the matter is still pending or fully decided without exhaustion of state appellate remedies. *See Younger,* 401 U.S. at 44, 91 S.Ct. 746; *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 608–09, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975); *Pennzoil v. Texaco,* 481 U.S. 1, 10–11, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987).

Taken together, these principles manifest an unequivocal purpose integral to this country's longstanding governmental arrangement. They convey the value of mutual federal-state court recognition and respect embodied in the concepts of comity and federalism frequently invoked and repeatedly reaffirmed by the Supreme Court as vital to the proper functioning of the justice system. As articulated by the Supreme Court, that notion reflects that:

> [A] proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate State governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in separate ways .... What the concept does represent is a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States.

*Younger,* 401 U.S. at 44, 91 S.Ct. 746; *see also Pennzoil,* 481 U.S. at 10–11, 107 S.Ct. 1519.

Implicit in the justice system's structural arrangement, as reflected in the division of labor arranged over the years, is that each component is equally competent, as and where appropriate, to apply federal law consistent with constitutional principles, as well as similarly bound by the judgments rendered by the other. *See* U.S. Constitution, Art. VI (declaring that "the Judges in every State shall be bound" by the federal Constitution, laws and treaties); *see also Stone v. Powell,* 428 U.S. 465, 493–94, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) (reaffirming the constitutional obligation of state courts to uphold and apply federal law, and expressing confidence in their ability to do so); *see also Pennzoil,* 481 U.S. at 15, 107 S.Ct. 1519 ("We cannot assume that state judges will interpret ambiguities in state procedural law to bar presentation of federal claims. Accordingly, when a litigant has not attempted to present his federal claims in related state-court proceedings, a federal court should assume that state procedures will afford an adequate remedy....") (citations omitted); *Huffman,* 420 U.S. at 611, 95 S.Ct. 1200 ("Appellee is in truth urging us to base a rule on the assumption that state judges will not be faithful to their constitutional responsibilities. This we refuse to do.").

A corollary to the principles of comity and competence, from the states' perspective, is that if state courts are to fulfill their obligations to abide by and carry out federal constitutional strictures, they must be free to do so with maximum decisional latitude and minimal intrusion from the federal system. *See generally Rooker* 263 U.S. at 416, 44 S.Ct. 149; *Feldman* 460 U.S. at 482–83, 103 S.Ct. 1303; *Pennzoil,* 481 U.S. at 10–11, 107 S.Ct. 1519.

3. *Access*

A third major imperative that enters here concerns access to the federal justice system. Encompassed within this principle is a basic purpose for which Congress created federal tribunals and conferred specific jurisdiction upon them: to afford persons who have legitimate claims subject to federal jurisdiction maximal opportunity to avail themselves of a federal forum to adjudicate their disputes. *See Willcox v. Consolidated Gas Co.*, 212 U.S. 19, 40, 29 S.Ct. 192, 53 L.Ed. 382 (1909) ("When a Federal Court is properly appealed to in a case over which it has by law jurisdiction, it is its duty to take such jurisdiction.... The right of a party plaintiff to choose a Federal court where there is a choice cannot be properly denied.") (citations omitted); *see also England v. Louisiana State Bd. of Med. Examrs.*, 375 U.S. 411, 415–16, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964) (noting that the abstention doctrine's "recognition of the role of state courts as the final expositors of state law implies no disregard for the primacy of the federal judiciary in deciding questions of federal law.")

By the same token, federal courts have a strong interest in administering the procedures and construing the substance of the national justice system, particularly as to aspects designed to enforce federal constitutional norms and prevent deprivation of federal rights. *See Zwickler v. Koota*, 389 U.S. 241, 247, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967) (noting that under various statutes Congress enacted after the Civil War, federal courts " 'became the primary and powerful reliances for vindicating every right given by the Constitution, the laws, and treaties of the United State.' ") (quoting Frankfurter & Landis, *The Business of the Supreme Court: A Study in the Federal Judicial System*, at 65). In this regard, the Supreme Court has observed that:

In thus expanding federal judicial power, Congress imposed the duty upon all levels of the federal judiciary to give due respect to a suitor's choice of a federal forum for the hearing and decision of his federal constitutional claims. Plainly, escape from that duty is not permissible merely because state courts also have the solemn responsibility, equally with the federal courts "... to guard, enforce, and protect every right granted or secured by the constitution of the United States...."

*Id.* at 248, 88 S.Ct. 391 (quoting *Robb v. Connolly*), 111 U.S. 624, 637, 4 S.Ct. 544, 28 L.Ed. 542 (1884); *Monroe v. Pape*, 365 U.S. 167, 183, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); but *cf. Huffman*, 420 U.S. at 606, n. 18, 95 S.Ct. 1200.

To no lesser degree, at times adding a contrapuntal strain to federal-state judicial relations, the states also "have important interests in administering certain aspects of their judicial systems," in particular in enforcing the orders and judgments of their courts. *Pennzoil*, 481 U.S. at 12–13, 107 S.Ct. 1519 (citing *Trainor v. Hernandez*, 431 U.S. 434, 441, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977); *Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982); *Juidice v. Vail*, 430 U.S. 327, 335–36, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977)).

Nevertheless, as is common wisdom, even the best laid plans are bound to contain inherent flaws, and—in the course of their evolution from idea to reality, from rudiments to perfected model—to encounter operational and developmental difficulties, and even to be tested by purposeful hindering or corruption of their effective functioning. To repair the imperfections, such deficiencies ordinarily engender demands for remedial work. In this country's historical development, the legal sys-

tem endured the "corrupting influence of the Ku Klux Klan and its sympathizers on the governments and law enforcement agencies...", which prompted Congressional concern that "the state courts had been deficient in protecting federal rights." *Allen*, 449 U.S. at 98–99, 101 S.Ct. 411 (1980) (citing *Monroe*, 365 U.S. at 174, 81 S.Ct. 473, and *Mitchum*, 407 U.S. at 241–42, 92 S.Ct. 2151). Congress responded by enacting 42 U.S.C. § 1983, described by the Supreme Court as representing the product of a "vast transformation from the concepts of federalism that had prevailed." *Mitchum*, 407 U.S. at 242, 92 S.Ct. 2151. In doing so, Congress conceived that it was

> altering the relationship between the States and the Nation with respect to the protection of federally created rights; it was concerned that state instrumentalities could not protect those rights; it realized that state officers might, in fact, be antipathetic to the vindication of those rights; and it believed that these failings extended to the state courts.

*Id.; see also Allen*, 449 U.S. at 99, 101 S.Ct. 411.

█ In this regard, the purpose of § 1983, as expressed by the Supreme Court, was to

> interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law, "whether that action be executive, legislative, or judicial."

*Mitchum*, 407 U.S. at 242, 92 S.Ct. 2151 (quoting *Ex parte Virginia*, 100 U.S. 339, 346, 10 Otto 339, 25 L.Ed. 676 (1879)); *see also Monroe*, 365 U.S. at 180, 81 S.Ct. 473.[10]

█ In brief, § 1983 empowered federal courts to "step in where state courts were unable or unwilling to protect federal rights." *Allen*, 449 U.S. at 101, 101 S.Ct. 411 (citing *Monroe*, 365 U.S. at 173–74, 81 S.Ct. 473). Even so, however, Congress' purpose was that of "adding to the jurisdiction of the federal courts, not subtracting from that of the state courts." *Allen*, 449 U.S. at 99, 101 S.Ct. 411 (citing *Monroe*, 365 U.S. at 183, 81 S.Ct. 473) ("The federal remedy is supplementary to the state remedy...."); *but cf.*, *Texaco*, 784 F.2d at 1144 ("To relegate the § 1983 claimant in such cases to the state court would ignore Congress' purpose in adopting that statute. Section 1983 was intended 'to provide dual or concurrent forums in the State and federal system, enabling the plaintiff to choose the forum in which to seek relief.") (internal citation omitted); *Miofsky v. Superior Court*, 703 F.2d 332, 335 (9th Cir.1983) ("[D]istrict courts have subject matter jurisdiction over suits brought under Section 1983 even when the state action that allegedly violated plaintiff's federally protected rights takes the form of state court proceedings.")

### 4. *Efficiencies*

█ The fourth set of principles that issues at the juncture here is designed to promote judicial efficiencies and operational practicalities within the state and federal courts as well as between the two

---

**10.** In *Monroe,* the Supreme Court described the origins of the statute as follows:

> It is abundantly clear that one reason the legislation was passed was to afford a federal right in federal courts because, by reason of prejudice, passion, neglect, intolerance or otherwise, state laws might not be enforced and the claims of citizens to the enjoyment of rights, privileges, and immunities guaranteed by the Fourteenth Amendment might be denied by the state agencies. 365 U.S. at 180.

legal systems. To this end, in the interest of consistency, avoidance of relitigation of settled matters and finality of judgments, both systems incorporate the firmly-rooted doctrines of *res judicata* and collateral estoppel.[11] But these concepts and the interests they serve are also essential to fostering federal-state comity. *See Allen,* 449 U.S. at 95–96, 101 S.Ct. 411 (acknowledging the value of *res judicata* and collateral estoppel not only in reducing unnecessary litigation and fostering reliance on adjudication, but also in "promot[ing] the comity between state and federal courts that has been recognized as a bulwark of the federal system.") (citing *Younger,* 401 U.S. at 43–45, 91 S.Ct. 746).

Recognizing the value of these doctrines to the justice system and to our notion of federalism, the Supreme Court has held that, despite the adjustments of judicial power effectuated by § 1983, in enacting that statute Congress did not intend to contravene the common law preclusion rules of *res judicata* and collateral estoppel or to repeal the full faith and credit federal courts must accord state court judgments pursuant to 28 U.S.C. § 1738. *See Allen,* 449 U.S. at 97–98, 101 S.Ct. 411 ("Section 1983 creates a new federal cause of action. It says nothing about the preclusive effect of state-court judgments.") For these reasons, federal district courts are obliged to accord due recognition to the preclusive effect of state court judgments that adjudicate federal rights after full and fair consideration, even if the state court's decision may have been erroneous. *See id.* at 101, 104, 101 S.Ct. 411.

The prescription embodied in the rules of preclusion derives not only from the policies of judicial economy and practicalities promoted by common law precedents, but from Congressional mandate enacted in 28 U.S.C. § 1738 requiring federal courts to give full faith and credit to state court judgments. *See Allen,* 449 U.S. at 96, 101 S.Ct. 411; *Migra,* 465 U.S. at 80–81, 104 S.Ct. 892. Accordingly, the Supreme Court held in *Allen* that judgments resolving issues that were actually litigated in state court proceedings are entitled to the same preclusive effect in a subsequent federal § 1983 action as such determinations would enjoy in the State courts that rendered them. *See Allen,* 449 U.S. at 105, 101 S.Ct. 411. Further advancing the interests and policies reflected by the common law rules of preclusion, the Supreme Court later extended *Allen* in holding that state court decisions grounded on federal issues must be accorded preclusive effect not only as to matters actually adjudicated in the prior state judicial proceedings, but also to those that could have been litigated in the state court. *See Migra,* 465 U.S. at 84–85, 104 S.Ct. 892.

### 5. *Reconciliation*

In abstract juxtaposition, the basic principles sketched out above seem at odds. On the one hand, they posit the existence of primary jurisdiction conferred upon federal tribunals charged to recognize the litigant's interest in access to a national forum to protect rights and remedies grounded on federal law. On the other, the principles compel restraints on the exercise of federal jurisdiction. In the in-

---

11. As described by the *Allen* Court:
 Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action. Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case.
 *Allen,* 449 U.S. at 94, 101 S.Ct. 411 (citations omitted).

terest of promoting judicial economy, consistency, finality of judgments and most particularly our notions of comity and federalism, they mandate federal court deference to the prior adjudications of state tribunals on the same matters, even those grounded on federal law.

Yet the several principles may be harmonized. From the intersection of principles and purposes, issues a clear message that, read as a whole, resonates consistently through the whole body of legislation and judicial doctrine on point enunciated over the course of more than two centuries of this country's history and jurisprudence. In measuring the values it reckons, and giving due weight to all that is at stake, Congress has struck a constitutional and policy balance resolving the tension between the various competing jurisdictional values. As construed and reaffirmed by the Supreme Court, the equilibrium holds that, subject from time to time to special adjustment to account for exceptional circumstances, "it is more important to give full faith and credit to state-court judgments than to ensure separate forums for federal and state claims." *Migra,* 465 U.S. at 84, 104 S.Ct. 892; *see also Huffman,* 420 U.S. at 606, 95 S.Ct. 1200; *Allen,* 449 U.S. at 105, 101 S.Ct. 411. Essentially the same reasoning supports a conclusion that a single avenue for federal appellate review of state court rulings based on federal law represents a more appropriate arrangement of our dual legal system than a structure which would encourage truncation of state judicial proceedings and superimposition of additional federal layers to the appellate process governing state court judgments.

### 6. The Reconciliation in Practice

#### a. Rooker–Feldman and the Rules of Preclusion

But, as is often the case, even an explicitly declared principle may be easier in distillation and articulation than it is in practice. Application of the balance propounded by the Supreme Court for adjusting the federal-state court jurisdiction, deference and comity values has yielded conflicting results, recurring uncertainties and unanswered questions. In particular, the precise demarcations of the *Rooker–Feldman* doctrine on the one hand, and the preclusive effect of common law *res judicata* and collateral estoppel on the other, remain obscure. Some courts hold them effectively synonymous, interchangeable or at least co-extensive. *See, e.g., Moccio,* 95 F.3d at 199–200 (noting that under *Rooker–Feldman* a claim would be barred if it would be foreclosed "under the principles of preclusion."); *Robinson v. Ariyoshi,* 753 F.2d 1468, 1472 (9th Cir. 1985) ("[W]e view the res judicata requirement of full and fair opportunity to litigate, and the *Feldman* 'inextricably intertwined' barrier to federal jurisdiction as two sides of the same coin."), *remanded on other grounds,* 477 U.S. 902, 106 S.Ct. 3269, 91 L.Ed.2d 560 (1986); *Gauthier v. Continental Diving Servs., Inc.,* 831 F.2d 559, 561 (5th Cir.1987) (noting that "*Rooker–Feldman* casts in jurisdictional terms a rule that is very close if not identical to the more familiar principle that a federal court must give full faith and credit to a state court judgment."); *but see GASH Assocs. v. Village of Rosemont, Ill.,* 995 F.2d 726, 728 (7th Cir.1993) (noting that "both sets of principles define the respect one court owes to an earlier judgment. But the two are not coextensive."); *Hachamovitch v. DeBuono,* 159 F.3d 687, 696 (2d Cir.1998) (noting that "[w]hether the *Rooker–Feldman* doctrine is coextensive with preclusion or extends beyond preclusionary rules is a question that has perplexed courts and commentators.").

Other courts have conflated the doctrines altogether, citing *Rooker–Feldman*

as support for application of what they held to be dismissal based on *res judicata. See, e.g., Robinson,* 753 F.2d at 1472 ("[W]e have read *Rooker* not as a jurisdictional barrier but as an application of res judicata."); *see also Turco v. Monroe Bar Ass'n,* 554 F.2d 515, 520–21 (2d Cir.), *cert. denied,* 434 U.S. 834, 98 S.Ct. 122, 54 L.Ed.2d 95 (1977); *Friarton Estates Corp. v. City of New York,* 681 F.2d 150, 158 (2d Cir.1982); *see generally* 18 Charles Alan Wright, Arthur R. Miller and Edward H. Cooper, *Federal Practice and Procedure* § 4469.1 (2001 Supp.) (herein "Wright, Miller & Cooper"); Gary Thompson, *The Rooker–Feldman Doctrine and the Subject Matter Jurisdiction of Federal District Courts,* 42 Rutgers L.Rev. 859, 866, 904 (1990).[12] *But cf. Worldwide Church of God v. McNair,* 805 F.2d 888, 893 (9th Cir.1986). A leading treatise characterizes *Rooker–Feldman* as a "transmutation of res judicata doctrine into jurisdictional dogma." Wright, Miller & Cooper, § 4469.1 at 665. And one circuit court has described the principle as "a combination of the abstention and res judicata doctrines...." *U.S. v. Owens,* 54 F.3d 271, 274 (6th Cir.) *cert. dismissed,* 516 U.S. 983, 116 S.Ct. 492, 133 L.Ed.2d 418 (1995); *see also E.B. v. Verniero,* 119 F.3d 1077, 1091 (3d Cir.1997) (referring to "Rooker–Feldman abstention"), *cert denied,* 522 U.S. 1109, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998).

■ And yet the doctrines differ in fundamental ways that may materially af-

fect how a case may be decided. *See generally* Wright, Miller & Cooper, § 4469.1, at 664 (noting that "[t]he Rooker–Feldman doctrine has been deliberately taken beyond some aspects of res judicata doctrine. It has independent force."). The Supreme Court has instructed that the *Rooker–Feldman* principle addresses the subject matter jurisdiction of federal district courts. In fact, as discussed above, the doctrine has a statutory predicate in 28 U.S.C. § 1257. That provision grants appellate review over state court decisions solely to the Supreme Court and thus, by negative inference, not to district courts established in the same legislation as courts of original jurisdiction. *See Rooker,* 263 U.S. at 416, 44 S.Ct. 149. In *Feldman* itself the Supreme Court expressly declared as ground for its holding that to the extent plaintiffs had sought appellate review in federal district court of a determination by a state court, "the District Court lacked subject matter jurisdiction over the complaints." *Feldman,* 460 U.S. at 482, 103 S.Ct. 1303. *See also Atlantic Coast Line,* 398 U.S. at 296, 90 S.Ct. 1739 (without citing to *Rooker,* noting that "lower federal courts possess no power whatever to sit in direct review of state court decisions."); *ASARCO,* 490 U.S. at 622, 109 S.Ct. 2037; *see also Texaco,* 784 F.2d at 1137 (dismissing certain claims "for lack of subject matter jurisdiction since they sought appellate review on the merits of the Texas judgment in violation of 28

---

**12.** Surveying the cases, the author concluded: The Rooker–Feldman doctrine has been mixed and matched with principles governing preclusion between state and federal courts. Before Feldman was decided in 1983, lower courts frequently cited Rooker as support for a holding on res judicata grounds. Feldman seemed to steer Rooker away from support of res judicata dismissal and toward dismissal for lack of jurisdiction. One year later, however, the Su-

preme Court decided Migra, and confusion continues in the federal courts on the relation between preclusion and the Rooker–Feldman doctrine.

In similar circumstances, some federal courts have applied Rooker–Feldman and some res judicata. Rooker–Feldman is often noted as an alternative basis for dismissal when res judicata applied.

Thompson, *Rooker–Feldman,* 42 Rutgers L.Rev. at 903–04. (citations omitted).

U.S.C. Section 1257 as interpreted by the United States Supreme Court."); *Moccio*, 95 F.3d at 198 ("A challenge under the *Rooker–Feldman* doctrine is for lack of subject matter jurisdiction") (citing *Gentner v. Shulman*, 55 F.3d 87, 89 (2d Cir. 1995)).

Reinforcing the jurisdictional underpinnings of *Rooker–Feldman*, the Seventh Circuit has ruled that the doctrine compels that its applicability must be determined before a district court considers *res judicata*. *See GASH Assocs.*, 995 F.2d at 728–29 (holding that the district court erred by dismissing the case on the basis of res judicata because *Rooker–Feldman* applied and thus deprived the court of jurisdiction); *Centres, Inc. v. Town of Brookfield*, 148 F.3d 699, 703 (7th Cir.1998) ("If *Rooker–Feldman* applies, a res judicata claim must not be reached."); *Garry v. Geils*, 82 F.3d 1362, 1365 (7th Cir.1996).

▆▆▆ By casting the doctrine as one barring federal court jurisdiction, the Supreme Court necessarily underscored the substantive and procedural distinctions between *Rooker–Feldman* and the preclusion effects of *res judicata* and collateral estoppel. Absence of subject matter jurisdiction operates as a bar to the exercise of the court's power to consider the merits of a case, and may be raised at any point, even *sua sponte* by the court. *See Moccio*, 95 F.3d at 198 ("A challenge to a federal court's subject matter jurisdiction under the *Rooker–Feldman* doctrine may be raised at any time by either party or sua sponte by the court."). A dismissal so grounded is not a judgment on the merits of the underlying case and does not of itself preclude a subsequent suit on the same matter. *See* Fed. R. Civ. p. 41(b); *St. Pierre v. Dyer*, 208 F.3d 394, 399–401 (2d Cir.2000); 18 James Wm. Moore et al, Moore's Federal Practice (3d ed. 1997) ("Moore's Federal Practice")

§ 131.30[3][b]. Moreover, the doctrine may apply to bar exercise of federal jurisdiction over actions involving both final and interlocutory judgments of state courts. *See Campbell v. Greisberger*, 80 F.3d 703, 706–07 (2d Cir.1996) (noting that "[i]t cannot be the meaning of *Rooker–Feldman* that, while the inferior federal courts are barred from reviewing final decisions of state courts, they are free to review interlocutory orders.").

▆▆▆ By contrast, *res judicata* and collateral estoppel, resting on common law principles, are affirmative defenses which, if not pleaded, may be waived. *See* Fed. R.Civ.P. 8(c); *Rivet v. Regions Bank*, 522 U.S. 470, 474, 118 S.Ct. 921, 139 L.Ed.2d 912 (1998); *Pangburn v. Culbertson*, 200 F.3d 65, 68 n. 1 (2d Cir.1999). To this degree, whether the preclusion doctrines are invoked thus may depend primarily on the alertness or competence of counsel. An application of either principle presupposes that the substance of the issues or claims deemed precluded was addressed in the prior litigation and embodied in a corresponding final judgment that constitutes a ruling on the merits. *See G. & C. Merriam Co. v. Saalfield*, 241 U.S. 22, 28, 36 S.Ct. 477, 60 L.Ed. 868 (1916); *Shamley v. ITT Corp.*, 869 F.2d 167, 170 (2d Cir.1989); *Baris v. Sulpicio Lines, Inc.*, 74 F.3d 567, 570 (5th Cir. *rehearing en banc*, 101 F.3d 367 (5th Cir.1996)); 18 Moore's Federal Practice § 131.30[3][a].

Moreover, because they generate from common law, the precise scope of the preclusion doctrines is not uniform, but may vary from state to state. And insofar as *res judicata* and collateral estoppel apply in federal actions to require the courts to accord preclusive effect to prior state adjudications, the mandate derives not from a jurisdictional statute, but from 28 U.S.C. § 1738 and general comity principles. *See Allen*, 449 U.S. at 96, 101 S.Ct. 411; *Krem-*

*er,* 456 U.S. at 466, 102 S.Ct. 1883. Unlike the purview of § 1257, these principles do not uniformly address the federal courts' subject matter jurisdiction. Rather, they mandate the federal tribunal giving full faith and credit to state court judgments only to the degree demanded by *res judicata* and collateral estoppel doctrines as recognized under the law of the particular state from which the judgment emerged. *See Allen,* 449 U.S. at 95–96, 101 S.Ct. 411; *Migra,* 465 U.S. at 85, 104 S.Ct. 892.

▉ Because it stems from § 1257, on the other hand, *Rooker–Feldman* applies to bar district court review only of state judicial decisions, and not to unreviewed determinations of state bodies acting in administrative, legislative or ministerial roles. *See Feldman,* 460 U.S. at 477–85, 103 S.Ct. 1303; *Van Harken v. City of Chicago,* 103 F.3d 1346, 1348–49 (7th Cir.), *cert. denied,* 520 U.S. 1241, 117 S.Ct. 1846, 137 L.Ed.2d 1049 (1997); 18 Moore's Federal Practice § 133.30[3][c](i). The common law preclusion rules, however, may extend to both judicial and administrative determinations. *See United States v. Utah Constr. & Mining Co.,* 384 U.S. 394, 422, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966); *Kirkland v. City of Peekskill,* 828 F.2d 104, 107–109 (2d Cir.1987); *Hachamovitch,* 159 F.3d at 694. On the same basis, *Rooker–Feldman* does not serve to bar federal jurisdiction brought by a party not involved in the prior state proceeding, *see Johnson v. De Grandy,* 512 U.S. 997, 1004–06, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994), while the rules of preclusion extend their binding effects to non-parties in privity with a litigant in the earlier action.

▉ Consistent with these rules, the application of res judicata and collateral estoppel presumes the exercise of the court's subject matter jurisdiction to review so much of the merits of a particular action as would allow a substantive determination of what issues or claims may have been resolved in some prior proceeding, thereafter barring collateral relitigation of those matters in another forum. *See Stoll v. Gottlieb,* 305 U.S. 165, 171–72, 59 S.Ct. 134, 83 L.Ed. 104 (1938); *Nemaizer v. Baker,* 793 F.2d 58, 65 (2d Cir.1986); *see generally* 18 Moore's Federal Practice § 131.30[1][d][ii]-[iii].

In the final analysis, the doctrinal distinctions discussed above have significance. The differences may be especially consequential in particular instances in which state law may not preclude collateral attacks on certain judgments, and thus the federal full faith and credit statute would not proscribe a later federal suit, but in which it nonetheless would serve important interests of the justice system to bar the subsequent relitigation in federal court. *See, e.g., GASH Assocs.,* 995 F.2d at 728; *Ritter v. Ross,* 992 F.2d 750, 755 (7th Cir.1993); *Garry,* 82 F.3d at 1369. One of the primary objectives served by the rules of preclusion is to bring finality to litigation. In some cases, how and where that finality is attained may be essential. Whatever the dictates of the rules of preclusion, it may at times better advance the overall interests of the parties and the legal system for finality to be achieved in state courts.

As in the case at bar, such occasions may arise where, for example, by virtue of the posture of the state proceeding at the time the federal action is commenced, opportunity for additional state review of the matter may be indicated or may still be timely. Such further consideration may be especially critical in matters like those at issue in *Feldman* and here—the licensing and disciplining of professionals—in which the states have an acute and unique stake because the underlying dispute involves a challenge to the state's regulatory scheme and the state itself is the party

accused of constitutional violations. Under these circumstances, insofar as renewed consideration, where feasible, may serve to conclude adjudication of incomplete state proceedings, ambiguous matters or new issues raised by later discovered evidence, the additional review and finality of the litigation may more appropriately occur by reopening of the state proceeding, rather than by foreclosing it in a federal court judgment applying the state rules of preclusion—a result which would not obtain in the case of a federal ruling rendered on the basis of absence of subject matter jurisdiction.

These circumstances underscore the observation of one treatise that "[o]ften there are good reasons to defer to state proceedings, and to refuse to set aside state-court orders, even though preclusion does not apply. The full faith and credit statute does not exhaust the principles of comity and abstention." Wright, Miller & Cooper, at 664. Moreover, the jurisdictional grounding of *Rooker–Feldman*, as another commentator has observed, "thus provides for a limited, uniform federal law of preclusion in cases that varying state laws may not foreclose." David P. Currie, *Res Judicata: The Neglected Defense*, 45 U. Chi. L.Rev. 317, 324 (1978).

#### b. *The Common Thread: "Inextricably Intertwined"*

 Implicitly recognizing that some overlap does exist in the practical effects of both the *Rooker–Feldman* principle and the preclusion of *res judicata* and collateral estoppel, the Supreme Court enunciated the "inextricably intertwined" test to bar exercise of jurisdiction if the matters presented in the federal forum cannot be disentangled from the merits of the state court's prior judgment on the same issue or claim. In *Feldman*, it noted that

[i]f the constitutional claims presented to a United States District Court are inextricably intertwined with the state court's denial in a judicial proceeding of a particular plaintiff's application for admission [to practice law], then the District Court is in essence being called upon to review the state court decision. This the District Court may not do.

*Feldman*, 460 U.S. at 483 n. 16, 103 S.Ct. 1303. However, the "inextricably intertwined" standard, as several courts have acknowledged, is ambiguous and "by itself does not provide district courts with a bright line rule." *Razatos v. Colorado Supreme Court*, 746 F.2d 1429, 1433 (10th Cir.1984), *cert. denied*, 471 U.S. 1016, 105 S.Ct. 2019, 85 L.Ed.2d 301 (1985).

Absent a more definitive statement delineating the scope of *Rooker–Feldman's* "inexorably intertwined" standard, the courts have propounded several defining concepts and relied upon various inquiries to guide application of the doctrine. Some of the factors focus on the nature and purpose of the federal action, as manifested by a close reading of the federal complaint. These considerations include: (1) whether the case brought in federal court by the party unsuccessful in state court amounts merely to a recasting of losing claims under a semblance of federal law causes of action not decided or interposed in the prior state proceeding, so that "in essence" the district court is being called upon to undertake appellate review of the state court decision, *see Feldman*, 460 U.S. at 483 n. 16, 103 S.Ct. 1303; (2) whether the invocation of the federal court's jurisdiction effectively seeks a "direct review" of a state court judgment, *see Atlantic Coast Line*, 398 U.S. at 296, 90 S.Ct. 1739 and *Allah v. Superior Court*, 871 F.2d 887, 891 (9th Cir.1989); (3) whether the federal proceeding represents a "general challenges" to specified state laws or rules, or rather a more "particularized challenge" to

a given state court adjudication as it applies to or affects the federal complainant, *Feldman,* 460 U.S. at 485–86 n. 18, 103 S.Ct. 1303; *Razatos,* 746 F.2d at 1433; *Stern v. Nix,* 840 F.2d 208, 212 (3d Cir.), *cert. denied,* 488 U.S. 826, 109 S.Ct. 77, 102 L.Ed.2d 53 (1988); (4) whether the federal remedy requested represents a "prospective" challenge directed at application of state rules or procedures in the future, or a "retrospective challenge" seeking injunctive relief to nullify or bar enforcement of a state court judgment, *Centifanti v. Nix,* 865 F.2d 1422, 1429–30 (3d Cir.1989); (5) whether the federal action contesting a state rule that was the subject of an earlier state proceeding may stand on its own, so that its purpose is " 'separable from and collateral to' " the related adjudication, *Pennzoil,* 481 U.S. at 21, 107 S.Ct. 1519 (Brennan, J., concurring) (citing *National Socialist Party v. Skokie,* 432 U.S. 43, 44, 97 S.Ct. 2205, 53 L.Ed.2d 96 (1977)).

In a variation of these standards, an inquiry enunciated by other courts turns on the source of the injury and its relationship to the relief the federal claimant seeks. Specifically, this tests asks (1) whether the alleged injury arises from the rendering of the state court judgment itself, or is distinct from plaintiff's loss in the state proceeding, *see Garry,* 82 F.3d at 1365–66; *GASH Assocs.,* 995 F.2d at 729; and (2) whether the federal plaintiff "is seeking to undo a [state court] remedial order of some sort," *Nesses v. Shepard,* 68 F.3d 1003, 1004 (7th Cir.1995).

Another definition proposed centers on the effect of the federal litigation, in particular whether the "federal claim succeeds only to the extent that the state court wrongly decided the issues before it," *Pennzoil,* 481 U.S. at 25, 107 S.Ct. 1519 (Marshall, J., concurring); *Hachamovitch,* 159 F.3d at 695–96; *Sheehan v. Marr,* 207 F.3d 35, 40 (1st Cir.2000).

Yet other tests look to what transpired in the state proceedings, including: (1) whether the party seeking federal relief has had a reasonable or full and fair opportunity to litigate his federal claim in state tribunals, including the party's ability to raise a claim on state appellate review, *see Wood v. Orange County,* 715 F.2d 1543, 1547 (11th Cir.1983), *cert. denied,* 467 U.S. 1210, 104 S.Ct. 2398, 81 L.Ed.2d 355 (1984); *Blue Cross & Blue Shield v. Weiner,* 868 F.2d 1550 (11th Cir.), *cert. denied,* 493 U.S. 892, 110 S.Ct. 239, 107 L.Ed.2d 190 (1989); and (2) whether in the state proceeding the court has undertaken "consideration" and "decision" on the merits of the issue or claim in contention, *Robinson,* 753 F.2d at 1472.

### c. *Rooker–Feldman vs. Abstention*

No greater clarity or precision exists in the gray zones where the jurisdictional strictures of *Rooker–Feldman* converge with the principles of comity and federalism that compel application of the doctrine of abstention in circumstances in which the *Rooker–Feldman* bar arguably appeared appropriate. *See Owens,* 54 F.3d at 274 (noting the relationship between *Rooker–Feldman* and abstention doctrines). In *Pennzoil,* for example, a plurality of the Supreme Court held, without addressing *Rooker–Feldman,* that the *Younger* abstention doctrine mandated reversal of the federal district court's decision. The lower court ruling had been predicated on a finding that *Rooker–Feldman* did not bar the court's assertion of subject matter jurisdiction. The district court thus enjoined a civil action still pending in state court to enforce a judgment under circumstances where, as characterized by the Supreme Court, "the State's interest in the proceeding are so important that exercise of the federal judicial power would disregard the comity between the States and the Nation-

al Government." 481 U.S. at 10, 107 S.Ct. 1519.

Conversely, in *Huffman* the Supreme Court reversed the district court's issuance of an injunction barring, on First Amendment grounds, enforcement of a state trial court order directing the closing of plaintiff's theater. The state court judgment was not appealed to the state's highest court. Accordingly, the federal district court's exercise of jurisdiction theoretically could have been barred by application of *Rooker–Feldman* principles. Instead, the Supreme Court, employing terms that resonate of *Rooker–Feldman*, . held, as in *Pennzoil*, that the district court should have abstained in accordance with the *Younger* doctrine:

> In short, we do not believe that a State's judicial system would be fairly accorded the opportunity to resolve federal issues arising in its courts if a federal district court were permitted to substitute itself for the State's appellate courts. We therefore hold that *Younger* standards must be met to justify federal intervention in a state judicial proceeding as to which a losing litigant has not exhausted his appellate remedies.

*Huffman*, 420 U.S. at 609, 95 S.Ct. 1200; *cf. Thomas v. Kadish*, 748 F.2d 276 (5th Cir.1984), *cert. denied*, 473 U.S. 907, 105 S.Ct. 3531, 87 L.Ed.2d 655 (1985) (applying *Rooker–Feldman*, without reference to abstention, to sustain dismissal for lack of subject matter jurisdiction where the plaintiff challenged in federal court, without appealing to the state Supreme Court, a trial court's denial of his application for admission to the state bar).

This review of the principles implicated in the instant case, given their relationships and inherent tension and the confusion surrounding their application, serves as the backdrop to the Court's consideration of the relevant facts at issue here.

## B. *APPLICATION OF PRINCIPLES*

Harris's federal claims under the ADA and the Rehabilitation Act allege that DOH refused to acknowledge evidence of his learning disabilities and revoked his medical license without considering or offering him reasonable means to accommodate those disabilities. His Fourteenth Amendment claims assert deficiencies in DOH's procedures. First, challenging the sufficiency of the BPMC hearing, Harris asserts that the BPMC committee ignored his presentation regarding his disabilities, did not adequately counter it and reached adverse conclusions of fact without an evidentiary record to support them. Second, Harris avers that DOH failed to reconsider its revocation decision after being presented with the November 2000 Letter containing additional information not previously available.

In its motion to dismiss, the State contends that Harris's federal statutory and constitutional claims, are barred by the Appellate Division's decision sustaining the determinations of the BPMC and the ARB. According to the State, Harris had a full and fair opportunity to litigate his claims before the Appellate Division, and that court's ruling considered and adjudicated the merits of Harris's allegations that he suffered from learning disabilities which could excuse his actions in providing false information in his hospital reappointment and medical license renewal applications. Thus, the State contends that, by application of the *Rooker–Feldman* doctrine, this Court lacks subject matter jurisdiction to reverse or modify the state court's judgment. Further, the state argues that the federal issues and claims Harris raises are also precluded on *res judicata* and collateral estoppel grounds. Separately, the State asserts that certain of Harris's causes of action must be dis-

missed as well pursuant to the Eleventh Amendment.

In the Court's reading, application of the dominant principles that emerge from the preceding analysis compels dismissal of Harris's federal constitutional and statutory claims under either the jurisdictional or preclusion theories. Harris's disability claims may also be dismissed on Eleventh Amendment grounds.

### 1. Rooker–Feldman

■ Harris's efforts to relitigate in this Court the revocation of his medical license are barred by application of the Rooker–Feldman doctrine. The Court finds three different grounds supporting this conclusion: Harris's action here, as evidenced by the remedies he seeks, amounts to a request for direct or indirect appellate review of a final judgment rendered by a state court resolving the same matters; the federal claims Harris asserts are inextricably intertwined with the merits of the state court adjudication; and Harris's federal issues are barred by the rules of preclusion under Second Circuit doctrine applying New York Law.

### a. Appellate Review

In the prayer for relief, Harris's complaint demands as legal and equitable remedies that DOH be ordered to restore Harris's license to practice medicine, with accommodation for his alleged learning disabilities, and to expunge all allegations and records in DOH's possession of Harris's professional misconduct and notify all persons who may have received information from such records that DOH's accusations were erroneous. This relief goes to the crux of the state court's judgment.

The State Appellate Division ruled unequivocally that DOH's determination was supported by the record, which included consideration and rejection of Harris's argument that his claimed learning disabilities explained and excused his misconduct, and that the DOH decision was not arbitrary and capricious. The injury Harris asserts in his federal action arises by reason of the Appellate Division's adverse ruling rejecting his disability defense and thus has no distinct standing separate and apart from his loss in the state court proceeding. See Garry, 82 F.3d at 1365–66. Moreover, to redress the claimed injury, the equitable remedy Harris seeks represents a retrospective challenge demanding injunctive relief to undo the license revocation judgment rendered by the state court. To this extent, his federal claim is not a general and prospective attack on the constitutionality of a state rule, such as the absence of procedures permitting the reopening of disciplinary proceedings challenged in Hachamovitch, but a particularized challenge directly or indirectly contesting the state court's adjudication as it affected only him. See Hachamovitch, 159 F.3d at 694. Reduced to its core, therefore, in this action Harris "in essence" asks this Court to reverse the State's revocation of his medical license. See Feldman, 460 U.S. at 483 n. 16, 103 S.Ct. 1303.

So viewed, Harris's claim effectively would require the Court to perform a direct appellate review function of examining the state court's ruling, finding that its judgment as regards Harris's claim of disability was wrong, and granting him essentially the same relief he failed to obtain before the Appellate Division on the basis of the same record as well as on essentially the same grounds that court deemed insufficient. It is precisely this form of stark second-guessing and undue federal intrusion that the Rooker–Feldman doctrine intended to overcome by depriving federal district courts of subject matter jurisdiction over cases that essentially demand

appellate review of judgments rendered in state judicial proceedings and thus seek to relitigate claims identical or inseparably linked with matters already resolved by the state courts. *See Rooker,* 263 U.S. at 416, 44 S.Ct. 149; *Feldman,* 460 U.S. at 483 n. 16, 103 S.Ct. 1303.

In *Feldman,* the Supreme Court noted several policies underlying the requirement that constitutional claims be raised in state court as a predicate for federal appellate review. Among those purposes are the "desirability of giving the state court the first opportunity to consider a state statute or rule in light of federal constitutional arguments" so as to enable the state court in response "to give the statute a saving construction", as well as the strength of the state interest in regulating admission to the practice of law, and presumably other professions. *Feldman,* 460 U.S. at 483 n. 16, 103 S.Ct. 1303. These policies serve not only to prevent unnecessary friction between state and federal courts, but to foster intersystem consistency and federal-state comity. *See Texaco,* 784 F.2d at 1142 (citing *Atlantic Coast Line,* 398 U.S. at 286, 90 S.Ct. 1739); *see generally* 18 Moore's Federal Practice at ¶ 133.30.

It is worth noting that the issues underlying Harris's petition here implicate matters—the State's efforts and policies to regulate the practice of medicine, the licensing standards it adopts to that end and its ways of preventing and punishing professional misconduct—that fundamentally fall within the traditional police power the states possess to protect and promote their citizens' health, safety and welfare. For a federal court to interject itself in such matters and overturn a state court's findings and judgment under the circumstances prevailing here could not avoid unwarranted meddling into the governmental province reserved for the states, contrary to the principles embodied in our concepts of comity and federalism.

b. *Inextricably Intertwined*

Beyond the proscription against direct review of final state judicial decisions, the *Rooker–Feldman* doctrine, as discussed above, applies to federal law claims brought in federal courts that were actually litigated or inextricably intertwined with the merits of the same matter previously adjudicated by the state court. Here, Harris's federal statutory claims under the ADA and the Rehabilitation Act are integrally connected with the matters decided in the state administrative proceedings whose findings were affirmed by the Appellate Division. Under Article 78, the standard of review is whether the administrative determination is arbitrary and capricious, affected by an error of law or an abuse of discretion, and the court's primary focus is on whether the agency ruling had a rational basis supported by fact. *See Harris,* 714 N.Y.S.2d at 367.

In order to prevail on his federal disabilities claims, Harris must establish that he suffers from a qualifying disability, that with a reasonable accommodation he is capable of adequately performing the work or services at issue, and that by reason of his disability he was unlawfully subjected to the adverse actions he asserts. *See Giordano v. City of New York,* 274 F.3d 740, 747 (2d Cir.2001). Harris contends that DOH failed to consider evidence of his disabilities and revoked his medical license without properly accommodating his disabilities. The Appellate Division expressly acknowledged Harris's assertions that his learning disabilities sufficiently explained and excused his fraudulent medical practices and found those arguments "unavailing here." *Harris,* 714 N.Y.S.2d at 368. The court noted that the administrative finder of fact was free to reject a petition-

er's explanation and excuses for misconduct, so long as the determination is not arbitrary or capricious. *See id.* The Court then found a substantial basis on the record before it to support the BPMC and ARB's findings and determinations. *See id.* That conclusion is tantamount to a ruling that the decision to revoke Harris's license was not affected by an error of law and was rational, which presumably included consideration of applicable state and federal law claims that were argued or that could have been interposed.

Thus, Harris's contentions here that the state's action violated federal disabilities statutes implicates the essence of the issue adjudicated by the state court. To this degree, his retrospective challenge seeking injunctive relief in this Court nullifying the state judgment is not "separable from and collateral to" the litigation of the same matter in state court. *Pennzoil,* 481 U.S. at 21, 107 S.Ct. 1519 (Brennan, J., concurring). Harris could not prevail on his federal disabilities claim asserted in the instant case—that DOH discriminated against him by reason of his learning disabilities—unless this Court first undertook a review of the state proceedings adjudicated by the Appellate Division and found that the issues the state court resolved were wrongly decided. *See id.* at 25, 107 S.Ct. 1519 (Marshall, J., concurring); *Hachamovitch,* 159 F.3d at 695–96.

In this regard, Harris appears to gloss over another significant consideration that bears on application of the *Rooker–Feldman* principle. Although Harris bases his challenge of DOH's action solely on the agency's rulings as they pertained to his false reporting, in fact DOH's revocation decision, as affirmed by the Appellate Division, was grounded as well on the BPMC and ARB findings of Harris's negligent and incompetent medical care rendered to two patients. *See Harris,* 714 N.Y.S.2d at 368. There is nothing in the record to indicate that DOH considered these determinants as separable from the fraudulent practice grounds, or that the fraud misconduct charges were necessarily more or less severe as reasons for a medical license revocation than Harris's providing patients inadequate or incompetent care. Indeed, both the ARB and the Appellate Division specifically noted that Harris's repeated fraudulent conduct determination alone was sufficient to uphold the revocation of Harris's license. *See* ARB Order, at 13. In particular, the Appellate Division explicitly held that "we decline to disturb the imposition of that penalty [of license revocation] in this matter, which also included findings of negligence and incompetence ...." *Harris,* 714 N.Y.S.2d at 369.

Harris's Fourteenth Amendment due process claim stands on no sounder footing under application of *Rooker–Feldman.* This claim rests on the allegation that DOH, despite its knowledge of Harris's learning disabilities and without countering the testimony presented by Harris and Migden, "made adverse conclusions of fact without evidence in the record to support such conclusions." (First Amended Complaint, at ¶ 100.) Harris's due process allegation does not reflect a general challenge to the sufficiency of the state's administrative processes. Rather, it appears to be a particularized challenge that as applied to him, the procedures followed by the state were deficient or that the decision itself was arbitrary or capricious or not grounded on applicable law, thus violating due process.

■■■ As to the first theory, the Second Circuit has observed that to prevail under a procedural due process claim a plaintiff must show that the procedural safeguards established by the state are insufficient to protect his rights. *See Moccio,* 95 F.3d at 200 (citing *Valmonte v. Bane,* 18 F.3d 992,

1002 (2d Cir.1994)). Here, as in *Moccio*, the protections afforded by the state to safeguard Harris's procedural due process rights are those provided by Article 78 itself. *See id.* Thus, for Harris to establish a violation, the Court would have to conclude that the Article 78 protections were insufficient to satisfy due process. *See id.* Harris makes no explicit allegation or showing of any kind from the record that would support such a determination here. As the *Moccio* court noted, such a finding would run counter to the *Feldman* prohibition against lower court federal jurisdiction over " 'challenges to state-court decisions in particular cases arising out of judicial proceedings even if those challenges allege that the state court's action was unconstitutional.' " *Id.* (quoting *Feldman*, 460 U.S. at 486, 103 S.Ct. 1303).

The second ground to support cognizable federal due process challenge, which appears more closely intimated by Harris's pleading, is that the State decision allegedly violated Fourteenth Amendment standards insofar as the license revocation was arbitrary, capricious, and tainted by impermissible considerations or based on an insufficient evidentiary record. *See County of Sacramento v. Lewis*, 523 U.S. 833, 845–46, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); *see also Harlen Associates v. Incorporated Village of Mineola*, 273 F.3d 494, 505 (2d Cir.2001) ("Substantive due process does not forbid governmental actions that might fairly be deemed arbitrary or capricious and for that reason correctable in a state court lawsuit. Its standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority.") (internal quotation omitted).

Like the Plaintiff's substantive due process claim in *Moccio*, Harris's claim on this ground was necessarily decided by the Ap-pellate Division in the Article 78 proceeding. *Cf. Moccio*, 95 F.3d at 201. The Appellate Division held that the ARB's findings had a "rational basis supported by fact" and were sufficient to sustain the revocation of Harris's license. *See Harris*, 714 N.Y.S.2d at 368–69. This conclusion precisely embodies the issues of fact and law that Harris presents in the case at bar and that "in essence" he asks this Court to overturn. *See Feldman*, 460 U.S. at 483 n. 16, 103 S.Ct. 1303. The *Rooker–Feldman* doctrine would bar the exercise of the Court's subject matter jurisdiction for this purpose.

### c. The Rules of Preclusion

Under the Second Circuit's reading and application of *Rooker–Feldman*, if the precise claims adjudicated in a state court proceeding are later raised in a federal action, the doctrine would proscribe federal court jurisdiction to relitigate the matter insofar as the claim "would be barred under the rules of preclusion." *Moccio*, 95 F.3d at 199–200. If, on the other hand, the party did not have a full and fair opportunity to present the claim in state court, the issues are not "inextricably intertwined" and not interdicted by the jurisdictional doctrine. *Id.* at 198 (citing *Texaco*, 784 F.2d at 1144–45).

Harris contends that the *Rooker–Feldman* does not apply because his federal learning disability claims were not presented as such to the Appellate Division. The Court disagrees. Under New York rules of preclusion, relitigation of the Appellate Division's decision denying the injunctive relief Harris requested in the form of restoration of his medical license, would be barred in a subsequent action in state court to the extent the merits of his subsequent federal disability claim as grounds to excuse his misconduct were necessarily and decisively adjudicated by

the Appellate Division and he had a full and fair opportunity to contest the ruling now said to be controlling. *See Giakoumelos v. Coughlin,* 88 F.3d 56, 59 (citing *Schwartz v. Public Adm'r of Bronx County,* 24 N.Y.2d 65, 298 N.Y.S.2d 955, 246 N.E.2d 725, 729 (1969)).

Even if Harris did not expressly articulate his request for injunctive relief in state court as grounded on federal disability law, because the bounds of *Rooker–Feldman* are regarded by the Second Circuit as, at minimum, coextensive with those of doctrines of *res judicata* and collateral estoppel, his request for such a remedy in this Court is barred. Harris could have raised his federal issues in the state court proceeding and had a reasonable opportunity to do so. *See Moccio,* 95 F.3d at 199; *see also Feldman,* 460 U.S. at 483 n. 16, 103 S.Ct. 1303 ("By failing to raise his claims in state court a plaintiff may forfeit his right to obtain review of the state court decision in any federal court."); *Migra,* 465 U.S. at 84–85, 104 S.Ct. 892. Under Second Circuit precedent, the *Rooker–Feldman* principle may bar assertion in federal court not only of issues and claims actually presented in state court but, under certain circumstances, of those that could have been raised. *See Moccio,* 95 F.3d at 199.

In *Moccio,* the Second Circuit considered this precise question. There, plaintiff, an employee of the state Office of Court Administration ("OCA") was dismissed following internal charges of misconduct that were sustained in an OCA administrative proceeding. Plaintiff then filed a petition under Article 78 seeking to vacate the OCA's decision. The Appellate Division upheld the termination of plaintiff's employment and dismissed the petition. Plaintiff then filed an action in federal court, pursuant to 42 U.S.C. § 1983 alleging violations of his constitutional rights of due process and equal protection under the Fourteenth Amendment. The district court, *sua sponte,* dismissed the complaint on the grounds that plaintiff's claims were barred by the *Rooker–Feldman* doctrine.

In affirming the district court, the Second Circuit noted that: "Although [plaintiff] contends that he never raised these precise constitutional claims in the Article 78 proceeding (which we presume to be the case), it cannot be doubtful that he could have raised these federal constitutional claims in that proceeding." *Moccio,* 95 F.3d at 199. The Court then framed the question before it to be whether plaintiff, "having failed to raise these constitutional claims in the state court proceeding where he was afforded the opportunity to do so, is barred by the *Rooker–Feldman* doctrine from raising the claims in the district court." *Id.*

After a thorough exposition of the underpinnings and scope of the doctrine, the court concluded that

> We agree that the Supreme Court's use of "inextricably intertwined" means, at a minimum, that where a federal plaintiff had an opportunity to litigate a claim in a state proceeding ... subsequent litigation of the claim will be barred under the *Rooker–Feldman* doctrine if it would be barred under the principles of preclusion.

*Id.* at 199–200.

Applying the preclusive rule of collateral estoppel to the facts in the case, the Circuit Court found that the issues presented in plaintiff's federal suit were necessarily presented and decided in the state proceeding. *Id.* at 201. *See also Moran v. New York State Dep't of Health,* 95 Civ. 5809, Slip. Op. (S.D.N.Y. July 29, 1996), *aff'd,* 111 F.3d 123 (2d Cir.1997) (finding that plaintiff's federal claims challenging the suspension of his medical license as

violating his rights under the ADA and the Rehabilitation Act were precluded by collateral estoppel because the state court's ruling in an Article 78 proceeding contesting the suspension necessarily rejected plaintiff's disability allegations); *Sassower v. Mangano*, 927 F.Supp. 113, 119 (S.D.N.Y.1996), *aff'd*, 122 F.3d 1057 (2d Cir.1997) (holding that federal action challenging suspension of plaintiff's license to practice law for professional misconduct was barred by both *Rooker–Feldman* and *res judicata* doctrines "[b]ecause all of the relief requested ... would necessarily involve direct, or at a minimum indirect, review of the propriety of those state court decisions".).

Responding to the State's preclusion arguments, Harris contends that he could not have asserted a discrimination claim during the administrative proceedings or the Article 78 action. Harris points out that he did not become aware of his learning disability until late 1998, when his case was under review by the BPMC, and that he did not have a full and fair opportunity to raise a discrimination issue during the Article 78 proceeding because his preliminary psychological diagnosis by Migden had not yet ruled out dementia. According to Harris, Migden's final report was sent to counsel on July 10, 2000 and Harris's reply brief to the Appellate Division was filed two days later on July 12. Harris thus maintains that he was unable to fully raise the disability issue until he actually did so in the November 2000 Letter. Finally, Harris argues that neither the monetary damages nor injunctive relief he seeks in the instant case were presented to the Appellate Division in the Article 78 proceeding, the purpose of which is limited to a review of whether an administrative determination is arbitrary and capricious or otherwise erroneous. The Court disagrees.

First, Harris's contentions are contradicted somewhat by his own pleadings. In the First Amended Complaint, Harris concedes that he "had raised the question of ADHD and learning disabilities as extenuating circumstances of and reasons for much of the behavior complained by the BPMC, the ARB and the Appellate Division." (Compl. at ¶ 72.) He then charges that those bodies did not give his "evidence of disability" the consideration required by the ADA. *Id.* In essence, Harris takes issue with the way the state administrative bodies and court treated his claim of disability. But whether the state proceedings rightly or wrongly decided his rights under federal law is immaterial to the issues of whether the merits of his claims were or could have been adjudicated by the Appellate Division and whether he may now collaterally attack the state court judgment in a federal court.

Second, as already discussed above, the central issues Harris asserts and that are decisive in this action were explicitly or implicitly reflected in the entire administrative record of the proceedings and decisions by the BPMC and ARB. There, Harris, by his own admission, presented his defense based on his learning disabilities in contesting the DOH's charges. Those bodies rejected Harris's contentions and evidence allegedly supporting them, including the testimony of Migden. These issues were also brought before the Appellate Division and necessarily decided there. *See Harris,* 714 N.Y.S.2d at 368.

Specifically, the record before this Court demonstrates that the ARB considered the assertions of error that Harris charged against BPMC's findings that Harris's learning disabilities were an implausible ground to excuse his fraudulent conduct; that Harris "represented a poor candidate for retraining due to his shortcomings"; and that BPMC took account of "mitigat-

ing factors" in the case when it imposed a penalty of revocation of Harris's medical license. *See* ARB Order at 5, 6, 10–12. In this regard, the ARB concluded that "[t]he Committee may also reject expert testimony that a respondent's false answers resulted from a medical condition the Respondent suffers." *Id.* at 9 (citing *Matter of Saldanha v. DeBuono*, 256 A.D.2d 935, 681 N.Y.S.2d 874 (N.Y.A.D. 3rd Dep't 1998)). The ARB also concluded that Harris was an unacceptable candidate for re-training or re-education programs, which conceivably may have addressed some or all of the measures Harris considered appropriate to accommodate his alleged disabilities, because Harris's conduct "demonstrates that he lacks integrity" and that previous DOH rulings had held that such programs do not "aid a physician who lacks integrity." ARB Order at 12 (citing *Matter of Bezar v. DeBuono*, 240 A.D.2d 978, 659 N.Y.S.2d 547 (N.Y.A.D. 3rd Dep't 1997)).

The Appellate Division acknowledged its consideration and rejection of Harris's claimed disabilities as "unavailing." *Harris*, 714 N.Y.S.2d at 368. More to the point, a necessary corollary of the matter decided by the state court in affirming the administrative agency's ruling as not arbitrary and capricious is that an accommodation for Harris's claimed disabilities, by way of retraining, rehabilitation or other mitigation short of revocation of his license, was not necessary under the circumstances presented. The Appellate Division's conclusion is precisely the issue that would be re-litigated in Harris's federal action were the instant case allowed to proceed.

That Harris did not expressly cast his arguments as actions arising under the ADA and the Rehabilitation Act does not observe the reality that, in fact, the Appellate Division considered and rejected Harris's learning disability theory and that nothing precluded him from asserting before the State court that his action was grounded on a denial of rights protected by the ADA and the Rehabilitation Act. *But cf. Moccio*, 95 F.3d at 199.

Harris also had a full and fair opportunity to contest the state determination he now challenges before this Court. Among the considerations to be weighed in the "full and fair opportunity" determination under New York law, as articulated by the Second Circuit, are the size and forum of the prior proceeding and the present availability of evidence not available at the time of the prior proceeding. *Id.* at 202 (citing *Schwartz*, 298 N.Y.S.2d 955, 246 N.E.2d at 725). Here, Harris participated fully and was represented by counsel in the BPMC, ARB and Appellate Division Article 78 proceeding. At each stage of the administrative process he had opportunity to present evidence.

Harris's argument that he was unable to raise his federal disability claims before the Appellate Division because he had not received Migden's final report until two days prior to the filing of Harris's reply brief in the Article 78 proceeding is unfounded. By his own admission, Harris had obtained the report by July 10, 2000 and became aware then that by ruling out dementia the report enabled Harris to pursue his discrimination claims. The Appellate Division hearing occurred on September 12, 2000 and its ruling was issued on October 19, 2000. Harris cites nothing that impeded him during that period from seeking a stay or reconsideration of the administrative proceedings to enable him to present a fuller record. *See* PHL § 230–c[4] (b) (granting the ARB authority to remand a case to BPMC for reconsideration or further proceedings). Nor was he precluded from amending his submission to the Appellate Division to more explicitly

invoke rights under the federal statutes as additional support for his challenge of the state administrative bodies' determinations. That he waited until submitting his request for reconsideration to the DOH in the November 2000 Letter—there establishing a self-proclaimed thirty-day deadline to receive a response and declare his administrative remedies exhausted—was a matter of his own choosing, not one compelled by any contrary rule of the state court. *See* N.Y.C.P.L.R. § 7805 (McKinney 2001) (permitting State Court to stay Article 78 proceedings on the motion of any party); *see also* N.Y.C.P.L.R. Rule 5015(a)(2) (McKinney 2001) (permitting state court to grant a party relief from an order or judgment upon the ground of newly discovered evidence).

A similar analysis pertains to Harris's federal Due Process claim. As discussed above, the central issue Harris alleges as the basis of his federal constitutional claim was actually and necessarily decided against him in the Article 78 proceeding by the Appellate Division's ruling that the State's revocation of Harris's medical license was not arbitrary or capricious, was not contrary to law and was supported by a rational and substantial basis in fact. *See Harris,* 714 N.Y.S.2d at 368–69.

To summarize the foregoing considerations indicating that Harris essentially seeks this Court to exercise appellate review over the state court's judgment: (1) Harris did not seek State Court of Appeals review of the Appellate Division's ruling; (2) this proceeding was commenced without definitive response from DOH to Harris's request for reconsideration; and (3) Harris had opportunity to pursue reconsideration at the Appellate Division but chose not to do so, filing the instant action instead. Accordingly, the Court concludes that by application of the *Rooker–Feldman* doctrine to the facts here presented, the

Court lacks subject matter jurisdiction over the instant case.

### 2. *Res Judicata and Collateral Estoppel*

The State argues alternatively that Harris's action is barred and thus may be dismissed by application of the doctrines of collateral estoppel and *res judicata.* With regard to the former, the Court's discussion and conclusion in its analysis of the *Rooker–Feldman* regarding the preclusive effect that may be accorded to the Appellate Division's judgment in the Article 78 proceeding apply with equal force to a separate determination that collateral estoppel would preclude Harris federal disability and Due Process claims. This conclusion is a necessary corollary of the Second Circuit's holding in *Moccio* that *Rooker–Feldman* applies to bar federal claims to the same extent such claims would be barred under state law principles of preclusion. *See Moccio,* 95 F.3d at 199–200.

Concerning *res judicata,* the State concedes that the doctrine would not operate to bar Harris's claim for monetary damages under an action brought pursuant to § 1983, since such recovery is not a permissible remedy in an Article 78 proceeding. (*See* Memorandum of Law in Support of Defendant's Motion to Dismiss the First Amended Complaint, dated November 5, 2001, at 11 n. 6.); *but cf. Moccio,* 95 F.3d at 200 (citing *Colon v. Coughlin,* 58 F.3d 865, 870 n. 3 (2d Cir.1995).) Harris's § 1983 monetary claims are discussed below. Insofar as his action requests injunctive remedies, such relief is precluded by the collateral estoppel doctrine already discussed, as well as by the principle of *res judicata.* Harris's argument that the Appellate Division's ruling cannot be given *res judicata* effect because no claim for injunctive relief was presented

to the court is without merit. Under New York law, as construed and applied by the Second Circuit, *res judicata* operates to bar a claim adjudicated in an earlier action "if both causes of action are grounded on the same gravamen or are part of the same 'factual grouping,' even if the later claim is brought under a different theory of recovery." *Kirkland v. City of Peekskill,* 828 F.2d 104, 110 (2d Cir.1987) (citing *Smith v. Russell Sage College,* 54 N.Y.2d 185, 445 N.Y.S.2d 68, 429 N.E.2d 746, 749–50 (1981)); *see also Waldman v. Village of Kiryas Joel,* 207 F.3d 105, 110 (2d Cir. 2000).

 Harris's Article 78 proceeding encompassed a claim for injunctive relief that was based on the same core facts upon which his claim for such a remedy in the instant action is grounded: the revocation of his medical license by reason of the misconduct that DOH charged and the state court upheld. The Appellate Division action was commenced by order to show cause, issued by Appellate Division Justice Edward O. Spain on August 18, 1999.[13] The Order indicates that Harris sought relief "annulling and otherwise reversing the [State's] determination and Order ... which revoked [Harris's] license to

practice medicine in the State of New York, ..." (*See* Reply Affidavit of Leonard A. Cohen, dated November 26, 2001, Ex. A, Order to Show Cause, entered August 18, 1999, *In the Matter of Monroe Harris, D.O.. )*

In fact, the Appellate Division acknowledged that because the charges of fraudulent conduct upheld by the State administrative boards were sufficient to sustain revocation of Harris's medical license, the court "decline[d] to disturb the imposition of that penalty in this matter." *Harris,* 714 N.Y.S.2d at 368–69. In affirming the ruling of the administrative bodies and denying the remedy Harris requested, the Appellate Division necessarily considered the form of injunctive relief implicated in the case at bar. By the same token, allowing Harris's instant action to proceed would require relitigation before this Court of matters already considered and embodied in the state court's judgment.

### 3. Eleventh Amendment Immunity

 Harris claims that by failing to accommodate his alleged learning disabilities so as to enable him to continue to practice medicine and instead revoking his medical license, DOH violated both Title II

---

**13.** In considering a motion to dismiss, the Court may consider documents attached as an exhibit thereto or incorporated by reference, *see* Federal Rule of Civil Procedure 10(c); *De Jesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 69 (2d Cir.1996), and documents that are "integral" to plaintiff's claims, even if not explicitly incorporated by reference. *Cortec Indus.,* 949 F.2d at 46–48. In addition, the Court may take judicial notice of admissions in pleadings and other documents in the public record filed by a party in other judicial proceedings that contradict the party's factual assertions in a subsequent action. *See Kramer v. Time Warner Inc.,* 937 F.2d 767, 774 (2d Cir.1991) (taking judicial notice on Rule 12(b)(6) motion of public documents filed with SEC and noting that "it is highly impractical and inconsistent with Federal Rule of

Evidence 201 to preclude a district court from considering such documents when faced with a motion to dismiss ...."); *see also Schnall v. Marine Midland Bank,* 225 F.3d 263, 266 (2d Cir.2000) (the court could consider a cardholder agreement, account history and monthly statements offered by defendants on a motion to dismiss where those documents were integral to the complaint and plaintiff had notice of them); *5–Star Management, Inc. v. Rogers,* 940 F.Supp. 512, 518 (E.D.N.Y. 1996) (taking judicial notice of pleadings in other lawsuits attached to defendants' motion to dismiss). Harris clearly had knowledge and notice of these public records pertaining to his own action, and there is no reason to preclude their consideration on this motion. *See Cortec Indus.,* 949 F.2d at 44–48.

of the ADA and § 504 of the Rehabilitation Act. DOH counters that both claims are barred by the State's Eleventh Amendment immunity. The Court agrees.

### a. *The ADA*

The Second Circuit in *Garcia v. SUNY Health Sciences Ctr. of Brooklyn*, 280 F.3d 98 (2d Cir.2001), recently considered the application of the Eleventh Amendment with regard to claims under both the ADA and the Rehabilitation Act. There the Circuit Court found that, as drafted, Title II exceeds Congress's authority under Section 5 of the Fourteenth Amendment to enact legislation for the enforcement of that Amendment. As a result, the Court held that the statute does not validly abrogate state sovereign immunity under the Eleventh Amendment to private damages suits in federal courts. *See id.* at 109. Rather than invalidating Title II in its entirety, however, the Circuit Court fashioned a remedy to permit effectuation of the essential purposes of the statute. *See id.* at 111, (citing *Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274, 284–85, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998)). As the applicable standard, the Court enunciated a test of "irrational discriminatory animus or ill will," and authorized Title II money damages claims to be heard where the plaintiffs asserting such claims "establish that the Title II violation was motivated by discriminatory animus or ill will based on the plaintiff's disability." *Id.* Applying the rule it had formulated, the Second Circuit found insufficient plaintiff's claim "simply that the State denied him the accommodation he sought . . . ." *Id.* at 112.

Here, Harris's First Amended Complaint likewise asserts merely that DOH revoked his license without first offering him an accommodation for his alleged learning disabilities. The Court finds nothing in the pleadings stating that DOH's action was motivated by irrational animus or ill will based on Harris's claimed disability. The Complaint pleads nothing more than a claim that DOH violated Harris's rights under the ADA by not providing him a reasonable accommodation for the disabilities he alleged, so as to enable him to continue his medical practices.

Indeed, as the factual recitation described above makes clear, Harris's learning disability claims were not asserted until disciplinary charges had been brought against him based on his alleged fraudulent reporting and incompetent practice, and the DOH administrative proceeding was well underway. Harris made no effort at that time to introduce into the administrative record the arguments and material upon which he now bases his claim.

Faced with these obstacles, Harris endeavors to overcome the deficiencies in his pleadings by raising arguments interposed for the first time in his opposition to DOH's motion to dismiss. *See* Plaintiff Monroe S. Harris's Opposition to Defendant's Motion to Dismiss, dated November 6, 2001 ("Pl.'s Opp."). There, Harris asserts that his "claim of discrimination is based entirely on defendant's apparent refusal to consider—to the point of not even responding [to]—the November 2 Letter." (Pl.'s Opp. at 4.) The correspondence referred to is the November 2000 Letter Harris sent to DOH, after the Appellate Division's October 19, 2000 ruling in the Article 78 proceeding, which purportedly transmitted Migden's 2000 Report containing his diagnosis of Harris's claimed disabilities.

Relying on the 2000 Report, Harris's November 2000 Letter requested reconsideration and reopening of DOH's determination. According to Harris, the DOH did not acknowledge or act upon that request, and this failure, he asserts, manifests "[b]lind prejudice, discriminatory animus,

and ill will due to disability, all exercised with defendant's might, majesty, dominion, and power, combined to shut the door on Dr. Harris." *Id.* Moreover, Harris seeks to demonstrate discriminatory motive manifesting the requisite ill will in some questions and comments posed by members of the BPMC Committee during Migden's testimony that suggested that Harris's explanation for his false reports was "implausible." *Id.* at 13–14, 24–25. Harris finds "institutional discriminatory animus and ill will against the learning disabled" in the ARB's upholding the BPMC's ruling. Specifically, he asserts:

> Like the BPMC, the ARB's real premise is that it is IMPLAUSIBLE that one can be one of us and have a learning disability. Our club does not allow for such things. We weed out such people. It is IMPLAUSIBLE that one could get in our club and survive in it without our knowledge for thirty-three years.

(*Id.* at 14 (emphasis in original).)

These arguments are unavailing in this Court at this point. Grandiloquence is not a proxy for the absence of substance. Nor is counsel's fulsome rhetoric sufficient to cure the fatal flaws in Harris's pleadings. Harris effectively concedes that his complaint lacks allegations sufficient to satisfy the *Garcia* standard. He nonetheless contends that it is not necessary for him to have pleaded discriminatory animus because the Second Circuit test was not enunciated until after the complaint was filed. (*See* Pl.'s Opp. at 26.) On Harris's theory, "[i]t is sufficient that this opposition memorandum [to DOH's motion to dismiss] makes those allegations and adduces significant evidence to support them." *Id.* This argument is wrong as a matter of law.

In considering a motion to dismiss, the court is limited to the well-pleaded factual allegations set forth in the complaint, doc-uments attached to the complaint as exhibits and other materials incorporated by reference in the complaint. *See Cortec Indus.*, 949 F.2d at 46–48. A plaintiff cannot oppose a motion to dismiss through assertions of facts and references to documents not reflected in the complaint at issue, and the parties' pleadings cannot be amended by these means. *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir.1998) (citing *IIT v. Cornfeld*, 619 F.2d 909, 914 n. 6 (2d Cir.1980)). Nor can a plaintiff defeat a motion to dismiss with conclusory allegations, unwarranted speculation or unsupported deductions or legal arguments cast as factual pleadings. *See Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1088 (2d Cir.1995); *see also* 15 Moore's Federal Practice § 12.34[1][b].

Ordinarily, the remedy for Harris's pleading deficiencies would be to permit further amendment of the complaint to assert his theory and factual basis for discriminatory animus. *See Local 802, Assoc. Musicians of Greater N.Y. v. Parker Meridien Hotel*, 145 F.3d 85, 89 (2d Cir.1998); *Day v. Morgenthau*, 909 F.2d 75, 78 (2d Cir.1990). The Court recognizes that such leave to file corrective amendments to pleadings should be "freely given when justice so requires." Fed.R.Civ.P. 15(a). However, in this instance the general rule does not apply. First, Harris has not sought leave to replead, arguing instead that it is not necessary to do. *See Anatian v. Coutts Bank*, 193 F.3d 85, 89 (2d Cir.1999), *cert. denied* 528 U.S. 1188, 120 S.Ct. 1241, 146 L.Ed.2d 100 (2000) (upholding dismissal of the complaint without leave to amend where plaintiff had not requested such leave or demonstrated how amendment would correct the shortcomings of the complaint).

Second, insofar as Harris's challenge to the state's action revoking his license rests upon the rejection by the DOH and the

state court of his claims of learning disability as an excuse for his misconduct, application of *res judicata*, collateral estoppel, *Rooker–Feldman* and the Eleventh Amendment, as the Court finds above, all bar relitigation of such claims. Thus, allowing an amendment of the complaint to enable Harris to replead those matters would be futile. *See Acito v. IMCERA Group, Inc.* 47 F.3d 47, 54–55 (2d Cir.1995) (amendment of the complaint is futile where it would fail to cure the deficiencies of the original complaint); *see also Milanese v. Rust–Oleum Corp.*, 244 F.3d 104, 110 (2d Cir.2001) (amendment futile where it would not survive a subsequent motion to dismiss); *In re American Express Co. Shareholder Litig.*, 39 F.3d 395, 402 (2d Cir.1994).

Third, to the extent Harris now seeks to ground his challenge of the State's action on the DOH's alleged failure to respond to his November 2000 Letter, even if the Court were to consider the argument as properly raised in his opposition to DOH's motion, he is presenting here for the first time, outside of the pleadings, a claim that he does not establish was the subject of any formal administrative consideration and authoritative ruling of any state judicial review. Harris does not set forth any facts demonstrating that his November 2000 Letter constituted a timely request for reconsideration properly filed under the applicable state administrative rules and that the DOH's failure to respond represented a valid denial of his request that in turn gave binding legal effect to the agency's original revocation of his license. Accordingly, as to this claim, there is no actual controlling state "action" and corresponding record before this Court for review, but only the alleged inaction manifested by DOH's failure to respond to the November 2000 Letter.

If indeed DOH's failure to respond to a properly made request for reconsideration could be deemed arbitrary and capricious, Harris did not seek to obtain state judicial review of this claim, and thereby develop a fuller record of the basis for DOH's treatment of the matter. Instead, he raises this claim here for the first time, not in a complaint, but in his opposition to DOH's motion to dismiss his First Amended Complaint and supporting it only with conclusory assertions and bare speculation maintaining that, in and of itself the DOH's alleged silence concerning his November 2000 Letter constituted irrational animus and ill will motivated by discriminatory purpose based on Harris's claimed learning disability.

Absent a more specific statement of an action taken by the State that rests on more than an aggrieved party's self-serving speculations and conclusions articulated outside the pleadings, such a challenge not only fails to plead facts sufficient to establish the elements of a cause of action under the relevant statutes, but raises issues as to whether the allegation represents a real dispute that is ripe for adjudication. *See generally Motor Vehicle Mfrs. Ass'n v. New York State Dep't of Envtl. Conservation,* 79 F.3d 1298, 1305 (2d Cir. 1996); *see also* 15 Moore's Federal Practice § 101.70(2). The uncertain or abstract posture of the matter also calls into question whether there is enough factual support to qualify this action as a viable case or controversy warranting the exercise of federal jurisdiction. As the Supreme Court reaffirmed in *Feldman:*

> A case arises, within the meaning of the Constitution, when any question respecting the Constitution, treaties or laws of the United States has assumed 'such a form that the judicial power is capable of acting on it.' ... A declaration on rights as they stand must be sought, not on rights which may arise in the future,

and there must be an actual controversy over an issue, not a desire for an abstract declaration of the law.

*Feldman,* 460 U.S. at 478, 103 S.Ct. 1303 (quoting *In re Summers,* 325 U.S. 561, 566–67, 65 S.Ct. 1307, 89 L.Ed. 1795 (1945)); *see also* 15 Moore's Federal Practice § 101.75.

### b. *The Rehabilitation Act*

Harris's claim that DOH's revocation of his license without offering him an accommodation for his alleged learning disability violated the Rehabilitation Act is also barred by Eleventh Amendment immunity as construed by the Second Circuit in *Garcia.* The *Garcia* court ruled that "[b]ecause § 504 of the Rehabilitation Act and Title II of the ADA offer essentially the same protections for people with disabilities ... our conclusion that Title II ... as a whole exceeds Congress's authority under § 5 of the Fourteenth Amendment applies with equal force to § 504 of the Rehabilitation Act." *See Garcia* 280 F.3d at 113 (citations omitted). Nonetheless, the court noted that because § 504 was enacted pursuant to Congress's authority under the Spending Clause of Article I of the Constitution, application of § 504 could still survive Eleventh Amendment preclusion if the state, as a condition of accepting federal funds governed by the statute, knowingly and intentionally waived its sovereign immunity from suit in federal court. *See id.* (citing *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666–87, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999)).

The Circuit Court noted that the statute contains a clear expression of Congress's intent to impose a state sovereign immunity waiver condition. *See id.* (quoting 42 U.S.C. § 2000 d–7). However, the court stressed that such waiver by the state must be "knowing and intentional," with " 'every reasonable presumption against

waiver' " to be indulged. *Id.* (quoting *College Sav. Bank,* 527 U.S. at 682, 119 S.Ct. 2219).

In applying these standards, the *Garcia* court held that, in fact, New York had not sufficiently expressed such a waiver because at the time the State accepted funds subject to § 504 conditions, it was reasonably understood that, because the proscriptions of the two statutes are "virtually identical," Congress's exercise of authority under Title II of the ADA had already abrogated the State's sovereign immunity in this area. *Id.* at 114. Accordingly, the Circuit Court concluded, "a state accepting conditioned federal funds could not have understood that in doing so it was actually abandoning its sovereign immunity from private damages suits ... since by all reasonable appearances state sovereign immunity had already been lost." *Id.* (citations omitted).

Here, the medical license revocation and other actions constituting the § 504 violation Harris alleges occurred, at their latest, up to the events relating to Harris's November 2000 Letter. That timeframe predates *Garcia* by over one year, and spans a period when the State had no reason to believe that its acceptance of § 504 funds effected a valid waiver of Eleventh Amendment sovereign immunity. Thus, no such knowing and intentional waiver existed and the Court cannot find in Harris's § 504 cause of action a viable claim of the State's violation of the Rehabilitation Act. *See Crosby v. New York State Dep't of Labor* No. 97 Civ. 0894, 2001 WL 1247888, *2 (N.D.N.Y. Oct. 17, 2001). For these reasons, Harris's Rehabilitation Act claim must be dismissed.

### C. *SECTION 1983 CLAIM*

Harris's third cause of action, invoking 42 U.S.C. § 1983, claims violations

of his rights to due process under the Fourteenth Amendment. He alleges that these claims arise from the DOH's revocation of his license to practice medicine on the basis of inadequate evidentiary support and its failure to consider the additional material Harris attempted to submit as grounds for reconsideration of the earlier administrative ruling. These claims name DOH as the sole defendant. Because neither the State nor its agencies qualify as "persons" under § 1983, they are not subject to suit under that statute. *See Will v. Michigan Dep't of State Police,* 491 U.S. 58, 64, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (reaffirming that "a State is not a person within the meaning of § 1983") (citing *Quern v. Jordan,* 440 U.S. 332, 342, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979)).

■ Moreover, absent valid abrogation or express waiver of State sovereign immunity, the Eleventh Amendment bars actions seeking retroactive damages in federal courts directly against a state or its agencies. *See id.; see also Santiago v. New York State Dep't of Correctional Services,* 945 F.2d 25, 28 n. 1 (2d Cir.1991) *cert. denied,* 502 U.S. 1094, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992) (stating that "[a]gencies of the state . . . are entitled to assert the state's Eleventh Amendment immunity where, for practical purposes, the agency is the alter ego of the state and the state is the real party in interest") (citing *Pennhurst State School and Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)).

Harris, apparently conceding the foregoing authority, does not respond to DOH's motion to dismiss his § 1983 claims on these grounds. Accordingly, dismissal of these claims without leave to replead is warranted.

### ORDER

For the reasons discussed above, it is hereby

**ORDERED**, that the Court's Order of December 20, 2001 is amended to incorporate the discussion set forth above; and it is finally

**ORDERED**, that defendant New York State Department of Health's motion to dismiss is granted with prejudice.

The Clerk of Court is directed to close this case.

**SO ORDERED.**